IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA
OKLAHOMA CITY

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Case No. 5:24-cr-00266-J-1 |
| ) | |
| RYAN BLOOM    ) | |

**DEFENDANT RYAN BLOOM'S MOTION TO DISQUALIFY
ASSISTANT UNITED STATES ATTORNEY D.H. DILBECK**

Defendant Ryan Bloom moves to disqualify Assistant United States Attorney D.H. Dilbeck for an impermissible financial conflict of interest that violates federal ethics rules and undermines the integrity of these proceedings.

**I. INTRODUCTION**

AUSA Dilbeck's wife has received over $165,000 in salary increases from Joseph Harroz Jr., who employs her at the University of Oklahoma. Harroz is also a director, shareholder, and founder of Valliance Bank—the alleged victim in this case. Federal law prohibits prosecutors from handling matters in which they or their family have a financial interest. Here, AUSA Dilbeck's family directly benefits from the continued goodwill of a key figure with the alleged victim entity, creating an impermissible personal stake in the prosecution's success and compromising the prosecutor's duty to seek justice impartially.

Mr. Bloom seeks only the recusal of AUSA Dilbeck, not the entire office. AUSA Danielle London recently entered an appearance and can continue the prosecution, ensuring no delay or prejudice to the government's case.

## II.   FACTUAL BACKGROUND

The facts are straightforward. AUSA Dilbeck is prosecuting this case while his wife receives substantial salary increases from Joseph Harroz Jr., who has a direct financial stake in the prosecution's success.

### A. The Conflict

AUSA Dilbeck's wife works for the University of Oklahoma, where she ultimately reports to University President Joseph Harroz Jr. But Harroz is not only a university administrator—he is also a director, shareholder, and founder of Valliance Bank, the alleged victim in this case.[1] This relationship creates competing loyalties that compromise AUSA Dilbeck's prosecutorial independence. AUSA Dilbeck's family income depends on Harroz' continued favor, and Harroz has a direct financial stake in this prosecution's success.

---

[1] About, Valliance Bank, https://valliance.bank/about (last visited August 20, 2025) (listing Joe Harroz as a member of the Board of Directors); Letter from Karen H. Bryant, Licensing Manager, Office of the Comptroller of the Currency, to David W. Durrett (Aug. 31, 2004), https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/2004/ca648.pdf (listing Harroz as a director at the time of the bank's initial founding twenty-one years ago); OKC Gains First New Bank in Eight Years; Valliance to Open in Early October, J. Rec. (Sept. 8, 2004), https://journalrecord.com/2004/09/08/okc-gains-first-new-bank-in-eight-years-valliance-to-open-in-early-october (describing Harroz as a shareholder and director at the time of the bank's founding more than twenty years ago).

To be clear, this is not a situation where the conflict arises from Mrs. Dilbeck's salaried role at the University of Oklahoma. The conflict here stems from the fact that the individual personally recommending and approving Mrs. Dilbeck's promotions and salary increases has a leadership position and ownership interest in the alleged victim—Valliance Bank.

**B. The Financial Benefits**

Under Harroz's leadership, Mrs. Dilbeck's salary has doubled—from $145,000 to $310,000—with the largest increase coming after Mr. Bloom's initial indictment and just two months before the superseding indictment.

In December 2019, as Harroz settled into his role as interim president at the University of Oklahoma, the bank director promoted Mrs. Dilbeck to Vice President for Public Affairs and Administration—a position that came with a $145,000 annual salary plus $36,600 in supplemental pay.[2]

Five months later, he promoted her again. This time he recommended that she be promoted to Vice President for Marketing and Communications and Chief Communications Officer. Harroz personally announced the appointment in a press release in which he touted the appointment.[3]

---

[2]   Meeting Minutes: The University of Oklahoma Board of Regents (Dec. 2, 2019), https://shareok.org/server/api/core/bitstreams/56c72f2c-3c2f-43b4-8be1-d0147bda3b1e/content.

[3]   OU Announces Vice President for Marketing and Communications, U. Okla. (May 1, 2020), https://www.ou.edu/web/news_events/articles/news_2020/ou-announces-vice-president-for-marketing-and-communications.

3

By March 2023, he recommended another promotion—this time to Executive Associate Athletic Director with a salary of $208,000.

Pay then accelerated sharply in March 2025—two months before the government sought a superseding indictment in this case. That month, Harroz recommended that Mrs. Dilbeck be promoted to Deputy Athletics Director. The position came with a $310,000 annual salary—a $100,000 per year salary increase.[4] Notably, this substantial increase occurred while the University of Oklahoma announced budget constraints requiring cuts to five percent of its athletics staff. The contrast between Mrs. Dilbeck's financial advancement and the university's broader fiscal retrenchment underscores the preferential treatment she has received under Harroz's leadership.[5]

Over six years, Harroz has overseen AUSA Dilbeck's spouse's advancement from mid-level administrator to Deputy Athletics Director, earning twice her original salary—including an increase in annual compensation of more than $100,000 in the year after Mr. Bloom's indictment.

---

[4]     Meeting Minutes, The University of Oklahoma Board of Regents (Mar. 10-11, 2025), https://shareok.org/server/api/core/bitstreams/50a5312d-a870-4dbb-8a85-824c990aea01/content.

[5]     Staff Shakeup, OU Daily, Mar. 7, 2025, https://www.oudaily.com/news/ou-athletic-department-staff-layoffs-revenue-sharing-athletes-joe-castiglione-nil/article_771a162e-bbdb-45b2-ae8f-dd166f2db979.html.

## C. The Lack of Transparency

Despite the obvious concerns this financial relationship poses, AUSA Dilbeck neither disclosed the potential conflict nor sought recusal. Instead, local counsel was forced to raise the issue with AUSA Dilbeck after the relationship between Mrs. Dilbeck and Harroz was referenced by witnesses in FBI 302 reports. When Mr. Bloom's counsel then requested information from AUSA Dilbeck about any conflict assessment and whether he consulted the Department of Justice's Professional Responsibility Advisory Office, AUSA Dilbeck refused to provide any information.

## D. The Questionable Tactics Employed by the Prosecution

This financial conflict coincides with prosecutorial tactics that depart markedly from the norm in similar cases. The investigation was admittedly threadbare. Despite that shortcoming, the prosecution proceeded directly to indictment without providing the customary target letter or advance notice typical in white-collar cases. AUSA Dilbeck then arranged for Mr. Bloom—a first-time defendant with no criminal history facing nonviolent charges—to be arrested at his residence in the presence of his minor child, who was left alone when agents took his father away in handcuffs.

The aggressive approach continued post-indictment. When flaws in the initial indictment were exposed, the government filed a superseding indictment that added charges and shifted theories. The government has also

5

taken an uncharacteristically cramped view of its discovery obligations. It has declined to document certain witness communications, withheld what defense counsel believes to be required *Brady* and *Giglio* material, and suggested that it may not call key witnesses—apparently to evade disclosure obligations.

These prosecutorial choices, taken together, create precisely the appearance of impropriety that federal ethics rules seek to prevent.

### III.   ARGUMENT

AUSA Dilbeck must be disqualified because his family's financial dependence on Joseph Harroz, Jr. creates an impermissible conflict of interest.

Federal prosecutors occupy a unique position in our justice system. They serve not as mere advocates but as ministers of justice whose "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The Supreme Court has therefore recognized the "requirement of a disinterested prosecutor," *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 804 (1987), and has warned that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions," *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980).

This special role demands the highest ethical standards. Federal law prohibits government attorneys from participating in matters where they or

6

their spouses have a financial interest. 18 U.S.C. § 208(a); *see also* 28 U.S.C. § 528 (requiring DOJ to promulgate rules disqualifying prosecutors from cases involving personal, financial, or political conflicts). Federal ethics regulations similarly mandate recusal when an employee's relationship with a party would cause a reasonable person to question the employee's impartiality. 5 C.F.R. § 2635.502(a)(2). These rules recognize that even the appearance of impropriety can undermine public confidence in the administration of justice.

Cases granting motions to disqualify prosecutors are rare—but only because the criminal conflicts of interest statute and federal ethics regulations deter most prosecutors from treading close to the line. AUSA Dilbeck has proceeded without the usual caution here, making this motion necessary.

But AUSA Dilbeck does have a disqualifying financial interest in this case. Harroz recommended a $100,000 increase to Mrs. Dilbeck's salary in March 2025, just two months before AUSA Dilbeck sought a superseding indictment in this case. Mrs. Dilbeck's March 2025 raise exceeds most prosecutors' entire annual salary.[6] And the Dilbeck family's windfall came while the university cut five percent of its athletics staff for budgetary reasons.

---

[6]   U.S. Dep't of Justice, Administratively Determined Pay Plan Charts (Jan. 12, 2025), https://www.justice.gov/usao/career-center/salary-information/administratively-determined-pay-plan-charts.

Mrs. Dilbeck's continued advancement depends on maintaining Harroz's favor while he has a direct financial stake in this prosecution's success. A reasonable observer would question whether AUSA Dilbeck can prosecute impartially when his family's financial well-being depends on someone whose bank stands to benefit from an aggressive prosecution.

## IV.   CONCLUSION

AUSA Dilbeck cannot serve as a disinterested minister of justice when his family's financial well-being depends on the alleged victim's goodwill. If he will not comply with federal ethics rules, the Court should disqualify him.

Date: August 20, 2025

Respectfully submitted,

*/s/ Edward J. Canter*

J. Alex Little (*pro hac vice*)
Edward J. Canter (*pro hac vice*)
Litson PLLC
54 Music Square E, Suite 300
Nashville, Tennessee 37203

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2025, a true and correct copy of the foregoing motion has been served via the court's CM/ECF system upon all counsel of record.

*/s/ Edward J. Canter*
Edward J. Canter