IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>　　Plaintiff, )<br>)<br>v. )<br>)<br>RYAN BLOOM, )<br>)<br>　　Defendant. ) | No.　<u>CR-24-266-J</u> |

**UNITED STATES' RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISQUALIFY**

Defendant Ryan Bloom has asked this Court to disqualify Assistant United States Attorney (AUSA) D.H. Dilbeck from participating in this case. Doc. 61. Once again, Mr. Bloom resorts to speculation, mischaracterization, and little legal argument. His motion rests on a seemingly nefarious tale about AUSA Dilbeck, his wife and her career, and University of Oklahoma President Joseph Harroz. But his tale does not withstand scrutiny, and it certainly does not establish an actual conflict, or the appearance of one, warranting disqualification. This Court should deny his motion.

The Tenth Circuit has recognized that "[t]he disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003) (quoting *Bullock v. Carver*, 910 F. Supp. 551, 559 (D. Utah 1995)).

Mr. Bloom offers two reasons why this Court should nonetheless take such a drastic step. First, Mr. Bloom claims that AUSA Dilbeck has a prohibited financial interest in the matter. *See* Doc. 61 at 7 (citing 18 U.S.C. § 208(a)). Second, Mr. Bloom suggests that a reasonable person would question AUSA Dilbeck's impartiality. *See id.* (citing 5 C.F.R. § 2635.502(a)(2)). Both arguments are meritless.

## I.   AUSA Dilbeck does not have a disqualifying financial interest in this matter.

Mr. Bloom first suggests that AUSA Dilbeck's prosecution of this case violates federal criminal laws, namely 18 U.S.C. § 208(a), regarding financial conflicts of interest among government employees. This argument fails because the effect (if any) by this case on AUSA Dilbeck's financial interest is highly attenuated and speculative, precisely the sort of effect that federal laws and regulations exclude from prohibited financial conflicts.

Federal law generally forbids an "employee of the executive branch of the United States Government" from "participat[ing] personally and substantially" as a government employee "in a judicial or other proceeding . . . charge, accusation, arrest, or other particular matter in which, to his knowledge, he [or] his spouse . . . has a financial interest." 18 U.S.C. § 208(a). But a government employee is prohibited from participating in a "particular matter," such as a criminal prosecution, only if the matter "will have a direct

2

and predictable effect" on the employee's financial interest. 5 C.F.R. § 2635.402(a). The key question currently before this Court is whether this case "will have a direct and predictable effect" on AUSA Dilbeck's financial interests. Federal regulations explain that a particular matter has a "direct and predictable effect" on a financial interest if:

> there is a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest. An effect may be direct even though it does not occur immediately. A particular matter will not have a direct effect on a financial interest, however, if the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter.

*Id.* § 2635.402(b)(1)(i). Simply put, "[a] particular matter will have a predictable effect if there is a real, as opposed to a speculative possibility that the matter will affect the financial interest." *Id.* § 2635.402(b)(1)(ii).

Mr. Bloom's motion cites none of these regulations, which is not surprising. Mr. Bloom has not—and cannot—show that AUSA Dilbeck's prosecution of this case "will have a direct and predictable effect" on his financial interest, *id.* § 2635.402(a), that is, Mr. Bloom fails to identify anything approaching "a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on" AUSA Dilbeck's financial interest, *id.* § 2635.402(b)(1)(i).

3

Instead, at most, Mr. Bloom musters a "speculative," "attenuated," and "contingent" account of the professional ties between Mrs. Dilbeck and President Harroz, and turns it into a demand for disqualification. *Id.* § 2635.402(b)(1)(i). Along the way, he resorts to outright mischaracterization and innuendo about Mrs. Dilbeck's career over the last six years and her recent advancement.

Most provocatively, Mr. Bloom notes that earlier this year President Harroz recommended a salary increase for Mrs. Dilbeck two months before AUSA Dilbeck sought a Superseding Indictment in this case. Mr. Bloom is hardly subtle with his sinister implication. *See* Doc. 61 at 7. But he omits key details about the March 2025 meeting of the University of Oklahoma Board of Regents to spin a story divorced from reality.

To begin, President Harroz recommended the appointments of three new employees and raises for five others beside Mrs. Dilbeck. *See Minutes of a Regular Meeting*, The University of Oklahoma Board of Regents, March 10–11, 2025, at 39578–79. Crucially, Mrs. Dilbeck's raise was commensurate with her new position as a Deputy Athletic Director, demonstrated by the fact that another Deputy Athletic Director received a similar raise to the same salary at the same time. *See id.* at 39578. Although President Harroz recommends personnel changes, the University of Oklahoma Board of Regents exercises independent authority to approve, reject, or amend them. And in fact, the

4

Board exercised its authority to amend four recommendations that President Harroz made at the same time as Mrs. Dilbeck's March 2025 promotion and raise. *See id.* at 39578–81.

The rest of Mr. Bloom's account of Mrs. Dilbeck's career is rife with similar distortions and omissions. And once again, under closer scrutiny, it offers no proof of a disqualifying financial interest. Mr. Bloom begins in December 2019, more than three years before the conduct that led to his criminal charges. At the time, Mrs. Dilbeck was serving as Associate Vice President, Public Affairs Administration, and was named Interim Vice President, Public Affairs Administration, with supplemental compensation for the additional interim responsibilities. Once again, this personnel change, like some two-dozen others recommended the same month, had to be approved by the University's Board of Regents. *See Minutes of a Regular Meeting*, The University of Oklahoma Board of Regents, December 11, 2019, at 39578–79.

Five months later, Mrs. Dilbeck was appointed the permanent Vice President for Marketing and Communications and Chief Communications Officer. Mr. Bloom cites an article announcing this appointment. Doc. 61 at 3. As the article explains, but Mr. Bloom fails to note, Mrs. Dilbeck was selected "by a search committee made up of faculty, staff and administrators," chaired by someone other than President Harroz, after "[a] national search." Once again, final approval for this appointment rested with the Board of Regents.

5

After a brief time working away from the University, Mrs. Dilbeck was recruited back by the University's Athletics Department in 2023. Since then, she has reported to the Director of Athletics, not President Harroz. And since then, consistent with university policy, the Director of Athletics, not the President, has conducted Mrs. Dilbeck's annual performance evaluation, which ultimately serves as the basis for any departmental-initiated recommendation of a merit-based promotion or pay increase.[1]

The goal of Mr. Bloom's distorted account of Mrs. Dilbeck's career is readily clear. He casts any promotion or pay raise as preferential treatment unilaterally bestowed by President Harroz—not a product of merit, channeled through ordinary personnel procedures and approved by the University's independent governing Board—all to insinuate that the financial interest of AUSA Dilbeck's family "depends" on President Harroz's "continued favor." Doc. 61 at 2.

But in this, Mr. Bloom only succeeds in stringing together a speculative, and at times baselessly conspiratorial, account of AUSA Dilbeck's supposed financial interest in this matter. At most, and barely if that, Mr. Bloom raises nothing more than a "chain of causation [that] is attenuated or is contingent

---

[1] University of Oklahoma Performance Evaluation Policy, https://oupolicy.policystat.com/policy/17533052/latest/; University of Oklahoma Compensation Policy, https://oupolicy.policystat.com/policy/17585651/latest/.

upon the occurrence of events that are speculative," not proof of a financial interest meriting the drastic step of disqualification. 5 C.F.R. § 2635.402(b)(1)(i).

## II. No reasonable person would question AUSA Dilbeck's impartiality and, in any event, Mr. Bloom's argument under 5 C.F.R. § 2635.502 is moot.

Alternatively, Mr. Bloom appears to suggest that this Court should disqualify AUSA Dilbeck for violating federal ethics regulations because his participation in the case "would cause a reasonable person with knowledge of the relevant facts to question [his] impartiality," and he has not recused himself. Doc. 61 at 7 (citing 5 C.F.R. § 2635.502(a)(2)).[2] For the reasons already discussed, this Court can readily conclude that, based on the facts Mr. Bloom has presented, no reasonable person would question AUSA Dilbeck's impartiality. Moreover, any argument to disqualify AUSA Dilbeck for a supposed violation of 5 C.F.R. § 2635.502 fails on its own terms. Mr. Bloom neglects to quote 5 C.F.R. § 2635.502(a)(2), or any other relevant subsections in 5 C.F.R. § 2635.502, and again it is not hard to see why. Because when read in detail, it is obvious that AUSA Dilbeck has not violated any ethics

---

[2] Mr. Bloom may have intended to cite subsection (a)(1), not (a)(2), of 5 C.F.R. § 2635.502, which appears to be the more apt one. Regardless, the argument presented here is applicable to both subsections.

7

regulations in 5 C.F.R. § 2635.502 and thus should not be disqualified on this basis.

    To begin, 5 C.F.R. § 2635.502(a)(2) provides in full:

> When an employee knows that a person with whom the employee has a covered relationship is or represents a party to a particular matter involving specific parties, and the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question their impartiality in the matter, the employee should not participate in the matter unless the employee has received a determination from the agency designee regarding the appearance problem in accordance with paragraph (c) of this section or received an authorization from the agency designee in accordance with paragraph (d) of this section.

Notably, the very next subsection provides that "[e]mployees who are concerned that circumstances other than those specifically described in . . . [§ 2635.502(a)(2)] would raise a question regarding their impartiality should use the process described in this section to determine whether they should not participate in a particular matter." *Id.* § 2635.502(a)(3). So, both an employee who *knows* a reasonable person might question his impartiality, and an employee who has *concerns* that a reasonable person might, are directed to the "agency designee" review process detailed in paragraphs (c) and (d) of § 2635.502.[3]

---

[3] In that way, 5 C.F.R. § 2635.502(a)(2) does not unequivocally "mandate recusal" as Mr. Bloom suggests. Doc. 61 at 7.

8

The process outlined in paragraph (c) is pertinent here. It first states:

> When the agency designee has information concerning a potential appearance problem arising from either the financial interest of a member of the employee's household in a particular matter involving specific parties or a particular matter involving specific parties in which a person with whom the employee has a covered relationship is a party or represents a party, the agency designee may make an independent determination as to whether a reasonable person with knowledge of the relevant facts would be likely to question the employee's impartiality in the matter.

5 C.F.R. § 2635.502(c)(1). Paragraph (c) then provides that "if the agency designee determines that the employee's impartiality is not likely to be questioned, the agency designee may advise the employee, including an employee who has reached a contrary conclusion under [§ 2635.502(a)(2)], that the employee's participation in the matter would be proper." *Id.* § 2635.502(c)(3).

Pursuant to 5 C.F.R. § 2635.502(c)(1), the United States Attorney—the Department of Justice's designee—was advised of the alleged impartiality issue and provided all the relevant information necessary to make an informed decision.[4] Pursuant to 5 C.F.R. § 2635.502(c)(3), the United States Attorney

---

[4] This matter first came to the attention of AUSA Dilbeck and the U.S. Attorney's Office in March 2025, after Mr. Bloom approached an employee of a company listed in invoices Valliance purchased and told the employee a version of the tale set forth in Mr. Bloom's motion to disqualify. The company, in turn, reported the encounter to the FBI, and stated that Mr. Bloom claimed that the alleged conflict was the only reason he was being "railroaded." The U.S. Attorney made his independent determination shortly thereafter.

9

determined that AUSA Dilbeck's "impartiality is not likely to be questioned" by "a reasonable person with knowledge of all the relevant facts," and determined that AUSA Dilbeck's "participation in this matter would be proper." *Id.* § 2635.502(c)(3). As a result, even if AUSA Dilbeck had concluded, or should have concluded, that a reasonable person could question his impartiality in this case (which he did not), he still is not in violation of § 2635.502(a)(2), as Mr. Bloom suggests. The U.S. Attorney has independently determined otherwise, consistent with § 2635.502. Thus, Mr. Bloom's fleeting reference to § 2635.502(a)(2) offers no credible basis for disqualification.

## III. Conclusion

Mr. Bloom asks for a "drastic measure," but gives this Court no credible reason to take it. Therefore, this Court should deny his motion to disqualify AUSA Dilbeck.[5]

---

[5] Local rules require that local counsel who sponsor pro hac vice counsel "shall continue in the case." LCr57.3(b). Local counsel have not signed any of Mr. Bloom's recent pretrial motions, and pro hac vice counsel have not included local counsel on any of its substantive letters or emails with the United States over the past several months. This Court may find it prudent to order Mr. Bloom's pro hac vice counsel to explain how exactly local counsel have meaningfully "continue[d] in the case."

10

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

*s/Danielle London*
DANIELLE LONDON
D.H. DILBECK
Assistant U.S. Attorneys
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
danielle.london@usdoj.gov

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 25, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: J. Alex Little, Zachary Lawson, Edward Canter, David Ogle, and Derek Chance, counsel for Defendant Ryan Bloom.

                                      *s/Danielle London*
                                      DANIELLE LONDON
                                      Assistant United States Attorney