1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF OKLAHOMA

3

UNITED STATES OF AMERICA,        )

4                                 )

        Plaintiff,                )

5                                 )

vs.                              )   Case No. CR-24-266-J

6                                 )

RYAN BLOOM,                       )

7                                 )

        Defendant.                )

8

9                      * * * * * * *

10               TRANSCRIPT OF PROCEEDINGS

11          BEFORE THE HONORABLE BERNARD M. JONES

12             UNITED STATES DISTRICT JUDGE

13                  SEPTEMBER 2, 2025

14                   AT 11:00 A.M.

15                   * * * * * * *

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

A P P E A R A N C E S

For the United States:

      Mr. D.H. Dilbeck
      Ms. Danielle London
      Assistant United States Attorney
      210 West Park Avenue, Suite 400
      Oklahoma City, Oklahoma 73102

For the Defendant:

      Mr. Joseph Alex Little, IV
      Mr. Edward Jonathan Canter
      Litson PLLC
      54 Music Square East, Suite 300
      Nashville, Tennessee 37203

1          (Proceedings held on September 2, 2025.)

2          THE COURT:  Let us transition now, the United States

3   vs. Bloom, CR-24-266.  And before I have you-all –– are

4   other –– are any other parties here for any other matter?  I

5   think these are the only two matters that were on docket call.

6   All right.  Let's get the parties for Bloom forward.

7          MR. LITTLE:  Would you like our client to sit with us?

8          THE COURT:  He can stay out there.  This is more of an

9   administrative function more than anything.

10          MR. LITTLE:  Thank you.

11          THE COURT:  Counselors, go ahead and enter your

12   appearances.

13          MR. DILBECK:  D.H. Dilbeck and Danielle London for the

14   United States.

15          MR. LITTLE:  Alex Little and Ted Canter for the

16   defendant.  Your Honor, thank you for allowing us to practice.

17          THE COURT:  All right.  Now, this is rather

18   interesting.  Before I get into my colloquy here, we've got

19   several issues here with respect to the motion to disqualify

20   that was filed.  And we need to have a little discussion here,

21   because certainly in reviewing the motion, the response and now

22   the reply, I remain conflicted as to how to proceed here.

23          On the one hand, this seems to be something that is much

24   to do about nothing, but at the same time, on the other, I'm

25   like, well, it's one of those things, just because you can,

1    doesn't mean you should.

2        And we ought to always be concerned about — to the extent

3    that there are already — to the extent that anything that has

4    done invites questions, ethical questions, we've got to pause.

5        And so I'm here looking at this and what I need to know,

6    defendants reference in their motion that a relationship

7    between Ms. Dilbeck and Harroz, that being Joe Harroz, the

8    president of the University of Oklahoma, that this relationship

9    was referenced by witnesses in the FBI 302 reports.

10        What exactly was said?

11        MR. DILBECK:  That 302 report was of a witness that

12    had contacted the case agent to report that Mr. Bloom had

13    raised this matter with him.

14        We addressed that in a footnote, I believe, in our

15    response.  So that witness was an employee of one of the

16    companies, third-party companies implicated in this case

17    generally.

18        But what was actually said in that report about this

19    matter came from Mr. Bloom to this individual.  And this

20    individual saw fit to contact the case agent and report the

21    conversation.

22        THE COURT:  So the defendant precipitated this

23    exchange, is that what you're telling me?

24        MR. DILBECK:  That's correct.

25        THE COURT:  All right.  This wasn't like — well, I

1  guess -- and so he went to the witness, shared this information
2  with the witness, and then the witness then brought it back to
3  the FBI?
4          MR. DILBECK:  That's correct.
5          THE COURT:  All right.  Is that your understanding as
6  well, Mr. Little, as to how this came about?
7          MR. CANTER:  Your Honor, this is Ted Canter.
8          THE COURT:  Oh, all right.
9          MR. CANTER:  May it please the Court.
10         Generally, yes, the defendant was at an electronic vehicle
11  charging conference in Las Vegas.  He interacted with an
12  individual who's associated with one of the companies that was
13  a former customer.
14         During that conversation, he expressed concern about the
15  relationship between the AUSA and Mr. Harroz, specifically in
16  connection to a recent promotion for the AUSA's wife, and
17  expressed concern that he was being railroaded because of that.
18  That was reflected in a 302.
19         THE COURT:  Was he aware that the individual was a
20  witness when he had those discussions?
21         MR. CANTER:  He was aware of the customer
22  relationship.  You know, to the extent that he was a witness,
23  I'm not sure if he is a witness in this case.  There is a 302
24  for him, but I don't know if the government plans to call him
25  as a witness or not.

1          THE COURT:  And you made reference to being a

2    customer, customer of the bank?

3          MR. CANTER:  Customer of Pathfinder HDD, LLC.

4          THE COURT:  Of Pathfinder, all right, who is your

5    client's or was your client's company prior to bankruptcy.  All

6    right.

7          MR. CANTER:  Yes, sir.

8          THE COURT:  And so -- okay.

9       So your client initiated that discussion and now you-all,

10   as a basis to disqualify, are relying on that.

11         MR. CANTER:  Well, Your Honor, I think we're relying

12   on more than that.  I mean, I think --

13         THE COURT:  Well, I want to stick to that.  We'll get

14   to the witness, there's some additional questions that I have,

15   but for at least this prong, your client initiated a

16   conversation with a prospective witness and then now that

17   serves as the basis for the need, in your mind, to disqualify

18   Mr. Dilbeck?

19         MR. CANTER:  In part.  I mean, there is actually two

20   conversations that occurred at this electronic vehicle charging

21   conference.

22      You know, I frankly initiated -- you know, who initiated

23   the conversations I think is a matter of dispute.  Certainly

24   the second conversation, the government's position is that

25   Mr. Bloom initiated it.  Our position is that the -- you know,

1    the subject of the witness tampering charge initiated that

2    conversation.

3         It is a basis — it is a basis for our motion, though,

4    because in those two conversations, it's reflected more clearly

5    in one of the 302s than the other, but there are discussions

6    about — well, let me take a step back.

7         The witness that he's referring to is associated with a

8    company called Osborn Company.  The second — the witness

9    tampering charge relates to two individuals who are associated

10   with Dynamic.

11        I don't believe that either of them had been interviewed

12   by the FBI at the time that that conversation occurred,

13   although I do think — not I think — I know that the owner of

14   the company or one of the other owners of the company was a

15   witness, had been interviewed and, you know, there were 302s

16   documenting it.

17        In the 302 reflecting this conversation in Las Vegas from

18   there, there's, like, an indirect reference to this.  He

19   describes — the witness describes — or sort of a confusing

20   tale about the banker's wife and insurance, which our view is

21   the same conversation that happened with the witness from the

22   Osborn Company.

23        So there is going to be testimony about this because there

24   is a witness tampering charge.  It is going to be coming at

25   issue.  You know, the government chose to charge witness

1    tampering; obviously, Mr. Bloom did not.

2         And there is an affirmative defense under 1512(e) where,

3    you know, if he believes that his goal in initiating this

4    conversation is to get a witness to testify truthfully, that's

5    an affirmative defense to the charge.  And, obviously, he has a

6    right to put on his case.

7         And I think, you know, it is going to come up in that

8    context, because part of the motivation for having these

9    conversations is the fact that he thinks he's being railroaded

10   by the government because of this improper conflict of

11   interest, namely Mr. Harroz approving a $100,000 raise for the

12   AUSA's wife.

13             THE COURT:  Before or after this litigation commenced?

14             MR. CANTER:  After this litigation commenced.  Well,

15   before and after.  I mean, there were raises that predate and

16   postdate it.

17             THE COURT:  Let me -- Mr. Dilbeck, how do you respond

18   to that?

19             MR. DILBECK:  Just one point of clarification that I

20   would make.  The conversation that was the basis, that is the

21   basis of the witness tampering charge is a separate

22   conversation from the one that we were discussing a moment ago

23   that was the basis of the initial 302 that brought this matter

24   to light, different individuals involved in that conversation,

25   to the extent that that wasn't clear for the Court.

1          THE COURT:  And I appreciate that, because that's

2     where — I was trying to — again, I want to just stick with

3     that initial one.

4          Certainly some degree, it makes a difference.  This would

5     be different if someone from the government initiated or if the

6     witness, I should say, initiated this conversation.  And it's

7     another thing if the defendant initiated this conversation,

8     knowing that that individual was a witness or would be called

9     as a witness in this matter, but let me switch a little bit.

10          Defendant states that Mrs. Dilbeck was Mr. Harroz's

11     director of communications while he served as the dean of the

12     OU law school.

13          And in light of that, I'm wondering, Mr. Dilbeck, do you

14     not agree that this could indicate that there is a closer

15     relationship than what was portrayed in the government's

16     response, in light of that close — arguably close working

17     relationship or presumably close working relationship?

18          MR. DILBECK:  Well, Your Honor, our response was

19     directed at the facts that were raised in the original motion.

20     That prior employment at law school was not mentioned in the

21     motion and our response was directed at the basis for a

22     potential disqualification as the defense raised it.

23          With that said, though, I'm happy to tell the Court that

24     what was represented in the reply, as best I can recall from

25     the dates that were mentioned there, was correct.  My wife did

1    work at the law school for approximately a year and a half, I

2    suppose, in that role at the rough date range that's reflected

3    in the reply.

4        THE COURT:  And the other thing that they have raised

5    is that there appears — you — this is, again, what is

6    alleged.  That you have a personal relationship at least with

7    at least one other Valliance Bank board member, Blair

8    Humphreys.

9        MR. DILBECK:  I would be curious to hear from the

10    defense what the basis of that personal relationship is.

11        MR. CANTER:  There are photographs we're happy to

12    provide to the Court.  We didn't want to put them in the

13    motion, just because it would potentially be embarrassing for

14    Mr. Dilbeck, but Mr. Dilbeck drinking with Mr. Humphreys.

15    Mr. Dilbeck, to be fair, does not have an alcoholic drink in

16    his hand, but Mr. Humphreys does, and so there's photographs of

17    them socializing.

18        THE COURT:  And where are these photos?

19        MR. CANTER:  I'm happy to — they're on social media.

20    I'm happy to provide them to the Court.

21        MR. DILBECK:  Your Honor, I'm happy to cut to the

22    chase on this, because I was curious where we were going with

23    it.  Hard to know with the ambiguous language in the reply.

24        In 2020, for approximately a year, Blair Humphreys and I

25    were next-door neighbors.  They moved out, to the best of my

1  recollection, about a year after that, 2021.  I can't recall

2  the last time I've had a conversation with him.

3      So wherever those pictures are from, I assume it would

4  have been something that might have happened on the

5  neighborhood block.

6          MR. LITTLE:  And Your Honor, I think this is part of

7  our concern is that, you know, Mr. Dilbeck sort of suggested by

8  his question that there was no basis for us to say that there

9  was a personal relationship, while he knew that he was his

10  next-door neighbor.  We don't know that.  We didn't know that

11  piece.

12      And that's kind of the way we've been dealing with the

13  government in this case, is sort of slowly, we find things,

14  turns out they're either true or there's more to the story, and

15  I just don't think it's a fulsome way and it adds to this

16  appearance of impropriety.

17      The issue is the appearance.  I've got a defendant who has

18  been indicted in an incredibly abnormal fashion with a very,

19  very kind of rubber stamp of the bank's investigation.  No real

20  FBI investigation at all.

21      He then finds out, and I think publically available, that

22  there's a relationship, at least a professional one, between

23  Mr. Dilbeck's wife and the primary board member, the chair of

24  this bank.  The appearance is terrible.  And all we can do is

25  raise it with the Court.

1          We don't know the ins and outs.  We don't know if they go

2    to dinner every week, we don't know if they just see each

3    other, you know, twice a month at the university or the bank.

4          And so all we can do is present that and say we don't

5    think that -- we think that it meets the appearance standard.

6               THE COURT:  So Mr. Harroz is the chair of the board?

7               MR. CANTER:  He's not the chair --

8               MR. LITTLE:  He's not now --

9               MR. CANTER:  He is a member of the board of directors.

10              THE COURT:  And the board of directors, not the

11   advisory board or any community board?

12              MR. CANTER:  The board.  And he has been since its

13   founding 20 years ago.  He's also a shareholder of the bank.

14              MR. LITTLE:  I meant that he was a founding board

15   member, not the chair.  He's been there since the beginning.

16              THE COURT:  Well, words certainly matter here, and in

17   particular, in this particular issue.

18         The other thing, Mr. Dilbeck, that's asserted is certainly

19   here, the defendant asserts that your ability to proceed is

20   further compromised by your decision to conduct substantive

21   case-related communications with witness Alison Hammond without

22   an agent present.  That, of all that has been alleged,

23   certainly that gave me some pause, but maybe not for the reason

24   that people would normally think.

25         Because you having conversations with this witness,

1    case-related conversations, substantive or otherwise -- well, I

2    guess they would all be substantive, I think that's important.

3    But I don't know if that in and of itself is enough, but the

4    question, though, does that -- do those conversations deviate

5    from normal course, normal policy, so as to give credence to

6    this concern of the appearance of impropriety?

7        Because rarely is it ever impropriety, it's always the

8    appearance that really hangs folks, certainly in our legal

9    profession, but what say you on that?

10        MR. DILBECK:  No, Your Honor, I think that allegation

11    is more relevant to the Brady-related filing that is still

12    pending.  It seems to me that it doesn't have any direct

13    bearing, certainly not to the same extent as the heart of

14    what's claimed in the motion to disqualify.

15        Beyond that, I don't have much more to add about that than

16    what's already in our response to that Brady-related motion.

17        THE COURT:  They also note that -- this is the other

18    thing, and I apologize for skipping over this to some degree,

19    but that -- in their reply they stated that there's a financial

20    conflict, will become trial evidence as part of Mr. Bloom's

21    affirmative defense under 1512(e).  And that your continued

22    involvement is likely to result in improper vouching.

23        Anything that you want to -- how do you want to respond to

24    that?

25        MR. DILBECK:  Your Honor, I think what I would say to

1  the to Court generally to put it on notice of a matter that
2  might become an issue is that our office, on August the 22nd,
3  received a Touhy letter, a Touhy demand indicating that the
4  defense would try to seek trial testimony, both from me and
5  from the case agent, from the FBI in this matter.

6      Our civil division, an attorney from our office's civil
7  division responded to that letter on August 26th laying out
8  what's required by the relevant Touhy regulations.  No
9  response, to the best of my knowledge, as of this morning.  We
10 haven't received any response from the defense yet.

11     There's some indication in the letter that maybe there
12 wouldn't be a response, consistent with the Touhy regulations,
13 though I'm not going to say that definitively, I'm just trying
14 to read between the lines in the letter.

15     But regardless, neither I, nor the case agent, as far as I
16 know, have received trial subpoenas yet.

17         MR. LITTLE:  Your Honor, I think there's a couple
18 things to deal with this particular side issue of Ms. Hammond.

19     I do think there is the fact that it was sort of contrary
20 to regulations DOJ and that it does sort of add credence to the
21 fact that once again, things are being done in an abnormal
22 fashion with the facts that we presented.  It —

23         THE COURT:  But let me stop you.  Are they required —
24 just because it deviates from — are those mandates or are
25 those best practices?  That's the question.

1          MR. LITTLE:  Justice Manual was a mandate of the

2   AUSAs.  They can breach them and they can come into court and

3   say there's no legal qualification, but an AUSA can't get a

4   waiver from the Justice Manual.  Those are policies promulgated

5   by the Deputy Attorney General with the Attorney General's

6   signature.  And so those are things they have to do and if they

7   don't do it, they can come and tell the Court it doesn't

8   matter, because it's our internal policies, but they're not

9   suggestions.

10          THE COURT:  Okay.

11      Go ahead, you were —

12          MR. LITTLE:  Yeah.  And so the Touhy issue is a little

13   bit separate, and we can deal with that with that motion, and I

14   will tell you we haven't sort of sent an additional Touhy

15   letter.

16      We have all sorts of concerns about the way we would do

17   that here, but we wanted to see how the Court was intending to

18   resolve this issue or whether it could be resolved, because it

19   might affect what goes into our Touhy letter and how we sort of

20   present these things.

21      But back on the witness obstruction issue, our client's

22   defense is that this witness, who has changed his story in 302,

23   so who said false information and then changed his information,

24   that in between that period of time, my client went to

25   coworkers or people who knew him and said, I'm really concerned

1    that this person is telling things that aren't true.  I'm
2    indicted and I'm looking at these reports and I know this is
3    false.  You know this is false.  And when I think about how
4    that could happen, I've learned this information about the
5    prosecutor and his wife's relationship with the board member
6    and Mr. Harroz.

7         And so if my client testifies about those issues, that
8    will be part of his entire defense, is to explain the basis for
9    his belief.  It's not just that I thought it was false because
10   I knew in my heart of heart it wasn't false.  I also now
11   thought that there was a motive for them to testify falsely
12   about me, which goes to the affirmative defense on the witness
13   tampering.

14        So that will become part of this case, that whole sort of
15   storyline about the relationship between the prosecutor and his
16   wife and Mr. Harroz.

17        That does put the government in a position of having a
18   prosecutor potentially arguing closing arguments saying, oh,
19   don't believe that, you know, that's just bogus, about things
20   about his wife.  And I think -- and you can't believe that
21   crazy defendant, he is just making stuff up, how dare he impugn
22   my wife's character or my character.

23        That's exactly the reason we have these rules and
24   regulations around the appearance, because the jury is going to
25   be incredibly confused.  And it has the potential to inject

1  issues.

2      If the government hadn't brought a witness tampering

3  charge, I think we would be in a different universe.  You'd

4  still have the issues that we've raised and the appearance of

5  those things, but they might not so directly affect how trial

6  would proceed.

7      And so I haven't touched so much on Ms. Hammond, except

8  that it is irregular, but I think the Touhy issue could

9  potentially come into much greater relief.

10      THE COURT:  And so in light of this, I mean, you know,

11  this gives me far more to consider.  I'm trying to understand

12  how we proceed at this point, at least this month.

13      It seems to me until I resolve this issue, we're really,

14  you know, at somewhat of a stand-still, you would agree?

15      MR. DILBECK:  I agree, Your Honor, that everything

16  that's pending in this case, that the motion to disqualify

17  should be the first priority.

18      THE COURT:  As do you?

19      MR. LITTLE:  We would agree.

20      MR. CANTER:  Yes, Your Honor.

21      THE COURT:  Now, I -- I'm struggling with this, and

22  since this was filed, I've struggled tremendously.  I'm always

23  concerned about precedent.  My preference is never to make it,

24  but always to follow it.  That is always how I've been, and

25  sometimes that works for me, sometimes it works against me.

1       But this is certainly a matter of first impression.  I

2   have never — I've entertained disqualification requests, but

3   never to this degree with this many facets, and certainly not

4   this close to trial.

5       Now, the good news is you-all weren't going to be up first

6   for trial anyway.  There's another matter that will take

7   precedence, but you-all — I don't know where you will be,

8   without the benefit of the calendar and without having resolved

9   these issues.

10      So I think — let me ask, if this Court were to continue

11  this matter to the October docket, does that present any speedy

12  trial issues?  I don't know without having —

13          MR. LITTLE:  It doesn't present speedy trial issues.

14  It does present a potential conflict.  I have a trial in

15  Seattle on October 20th that is three years old that has to go

16  then.  We've asked the Court for — there's some appellate

17  issues rolling around in that case, and I would tell you if

18  that changes.

19      So we could do it the very beginning of October and be

20  done, because I think this is an eight-day trial max, but if it

21  slipped into later in the October docket, we would have issues.

22      Now, I would have to talk to my client about November, I

23  think we could probably make November work as well if the Court

24  just wants to kick it to the November docket, give us time to

25  clear the issues before then, but I would just need to confirm

1    with him that he's comfortable with that.

2         MR. DILBECK:  Your Honor, I think what I would simply

3    say is if the Court is able to resolve the matter in the

4    relatively short time frame that we're on, that our office is

5    prepared to proceed in September, whether it's me on the case

6    or someone else in the office on the case.  We would favor

7    staying where we are.

8         THE COURT:  And if we did maintain the existing

9    schedule, you-all will probably — this matter would be set

10   September 29th, which would run into October.

11        MR. LITTLE:  That's fine, Your Honor.

12        THE COURT:  But, again, I need to, you know, get my

13   bearings here and better appreciate things.  So — all right.

14        Well, then, what I will do, I'm going to take this matter

15   under further advisement here today.  I don't want to proceed

16   with our docket call colloquy, in light of what I may very well

17   do here.

18        To the extent that if I'm inclined to strike this matter

19   from this trial docket, I don't even think I would reset it for

20   November.  What I would prefer instead is for you-all to get

21   together and try to figure this out and make sure there are no

22   conflicts, but I don't know, quite frankly, and I want to spend

23   a little more time delving deeper into this and trying to

24   identify precedent that would provide guidance.

25        But I will say, Mr. Dilbeck, it's — I think that the

1    stronger argument here is what they've made with respect to

2    perceptions.  The perception of impropriety is always worse

3    than impropriety itself, but I'm not entirely certain, based on

4    what has transpired, that we will have a perception issue in

5    and of itself, so that's what I'm trying to figure out here.

6         Because these are always dicey, and but for — were this

7    just a singular issue, a singular conversation or singular

8    relationship that wasn't as multi-facetted as this appears, I

9    think this would be an easier call for me.  I think I would be

10   able to easily say I don't find any merit in this, I think that

11   there's a lot of stretching here that even Mr. Fantastic could

12   appreciate.  But that's not what we have here.

13        And so this has caused me to pause far more than I

14   normally would, because I do think there's some valid arguments

15   that have been raised, but again, going back to what I've said

16   before, I think those arguments ought to be tested and they

17   ought to be tested against precedent, which I have yet to be

18   able to discern at this point.

19        So I want to think a little bit more about this.  So what

20   I will do here today, I will just simply note that we will

21   continue docket call and trial, to the extent that it is not

22   simply continued for a date certain, we will specially set

23   everything so as to give you-all some additional direction as

24   to where we're headed here.

25        But I would also encourage you, as I always do and as I

1    always conclude docket call, without anyone perceiving this as

2    being an intimation of guilt, certainly you-all ought to try to

3    resolve this and any other issues to the best of your

4    abilities.  To the extent that you can narrow these issues, you

5    ought to be working to do that.

6         It's always helpful and I'm a firm believer that things

7    work best when the parties resolve their matters without the

8    intervention of the Court.  So irrespective of what we think or

9    how we feel, we've got to find a way to try to make some

10   progress here.

11        So I'm going to go ahead and, again, I will take this

12   matter under further advisement and hope to have some answer

13   for you-all soon as to what we're going to do and how we will

14   do it, all right?

15        Anything further before we adjourn here today?

16             MR. DILBECK:  No, Your Honor.

17             MR. LITTLE:  Your Honor, I assume by that, the

18   deadlines for this week are stayed until further order of the

19   Court?

20             THE COURT:  I think that's appropriate.  That was

21   going to be something that we note in our order here today,

22   but, yes, we'll stay the deadlines and then we will let you-all

23   know in the form of an order.

24             MR. LITTLE:  I have one last issue, I apologize.  This

25   is a weird one.  With all the hacking and the new rules on

1  sealing, we talked to the court clerk to ask whether you have a
2  preference as to how materials that are going to be filed under
3  seal should be presented to your office.  Whether you want a
4  hard copy Fed-Ex, email your chambers, like, how do you want
5  those?
6          THE COURT:  Well, I think emailing undermines, quite
7  frankly, the goal of what the general order established.  So I
8  think that -- I would encourage you to visit with Mr. Lee about
9  how he would like that handled.
10     We've -- in some respects, we've, you know, gone back to
11  the Stone Ages, which are fine to me, I don't mind.  I know
12  there's some folks who hate to destroy trees.  I do, too.  But
13  some things are necessary.
14     So just visit with Mr. Lee and he will provide direction
15  as to how.  But more than anything, we need to do our very best
16  to comply with both the letter and the spirit of that general
17  order, because we want to ensure that we are safeguarding the
18  privacy of all involved.
19          MR. LITTLE:  Thank you, Your Honor.
20          THE COURT:  All right.
21     With that, we are adjourned.
22      (Adjourned.)
23
24
25

CERTIFICATE OF OFFICIAL REPORTER

I, Susan J. Fenimore, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of September, 2025


/s/SUSAN J. FENIMORE

Susan J. Fenimore, CSR, RPR, FCRR
Federal Official Court Reporter